IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| RAO MANDALAPU, M.D, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY HOSPITAL, ET AL. | : | NO. 15-5977 |

<u>MEMORANDUM</u>

**Padova, J.**                                                    **September 27, 2016**

Plaintiff Rao Mandalapu, M.D. commenced this employment discrimination action against Defendant Temple University Hospital ("TUH"), Doctor Jack H. Mydlo, and several other doctors at TUH (the "Defendant Doctors"), after he was terminated from TUH's urology residence program.   Defendants have moved to dismiss the First Amended Complaint ("the Complaint") pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted.   For the following reasons, we deny Defendants' Motion.

## I.    BACKGROUND

The Complaint alleges that Plaintiff Rao Mandalapu was born in India, but currently lives in the United States.  (Compl. ¶¶ 6, 18.)  He retains a discernible Indian accent.  (<u>Id.</u> ¶ 18.) Plaintiff is a Board-certified surgeon in India and has begun the process to become a certified urologic physician with the American Board of Urology.  (<u>Id.</u> ¶¶ 19, 21-25.)   In order to become a certified urologic physician, a candidate must complete five clinical years of post-graduate medical training ("PGY-1" through "PGY-5") with urology residence programs that are accredited by the Accreditation Council for Graduate Medical Education ("ACGME"), and the last two years (PGY-4 and PGY-5) must be with the same program.  (<u>Id.</u> ¶¶ 22-24.)  Plaintiff successfully completed the first three years of that post-graduate training with accredited programs and, on May 9, 2011, he signed a contract with TUH to complete his fourth year during the 2011/2012 academic

year in TUH's residency program.  (Id. ¶¶ 25-26.)  TUH admitted only one other categorical urology resident for that academic year ("Resident 2").  (Id. ¶ 29.)   Unlike Plaintiff, Resident 2 is a Caucasian American.  (Id. ¶ 30.)

During the course of his residency with TUH, Plaintiff primarily reported to TUH's Residency Program Director, Defendant Dr. Jack Mydlo.  (Id. ¶ 31.)  Plaintiff distinguished himself as a hard-working resident, did not exhibit any disciplinary concerns, and performed well academically.  (Id. ¶ 32; see also id. ¶¶ 33-35.)  In spite of his academic and work achievements, Plaintiff was subjected to discriminatory treatment by the Defendant Doctors "because of his race, ancestry, ethnic and linguistic characteristics, including . . . being subjected to discriminatory comments and jokes about his accent."[1]  (Id. ¶ 36.)  Plaintiff complained to TUH's management, including Mydlo, about this discriminatory behavior, and Mydlo admitted "that the other Defendant Doctors were hesitant to have him work with their patients because of his accent."  (Id. ¶¶ 36, 55.)

In April of 2012, Plaintiff was promoted to PGY-5 resident within TUH's urology residency program and signed a contract for the 2012/2013 academic year.  (Id. ¶¶ 37-38.)  Prior to this time, no member of management had advised Plaintiff of any perceived performance problems.  (Id. ¶ 40.)  In May 2012, however, Mydlo and other faculty members, including the Defendant Doctors, submitted evaluations of Plaintiff's work from July 2011 through October 2011, and Mydlo met with Plaintiff to discuss those evaluations on May 24, 2012.  (Id. ¶¶ 42, 44,

---

[1] The allegations of the Complaint do not distinguish among the Defendant Doctors, except when first listing them as Defendants.  (See Compl. ¶¶ 9-15)  The caption of the Complaint includes eight doctors in addition to Mydlo:  Dr. Robert Guy Uzzo, Dr. Richard E. Greenburg, Dr. David Y.T. Chen, Dr. Alexander Kutikov, Dr. Robert S. Charles, Dr. Steven J. Hirshberg, and Dr. Yan Shibutani.   In contrast, the caption of Plaintiff's response to Defendants' Motion to Dismiss lists only three doctors in addition to Mydlo, i.e., Dr. Uzzo, Dr. Greenburg, and Dr. Chen.   Accordingly, it is not entirely clear whether Plaintiff is proceeding against the eight Defendant Doctors or just the three referenced in his response to Defendants' Motion.

46, 51.)   Mydlo explained during that May 2012 meeting that Plaintiff's performance had been sub-par compared to Resident 2 and that, as a result, he would not be promoted to the next level after all.   (Id. ¶ 44.)   In addition, Plaintiff was denied credit for the 2011/2012 academic year. (Id. ¶ 54.)   In contrast, Resident 2 was given credit and promoted to PGY-5.   (Id.)

After being issued his evaluations, Plaintiff continued to complain to management about feeling discriminated against in the workplace because of his race and ethnic/linguistic characteristics.   (Id. ¶ 56.)   In June 2012, Plaintiff received a letter from Mydlo dated June 6, 2012, which stated that he was terminated from the TUH's program due to poor performance. (Id. ¶ 57.)   However, Mydlo "had previously informed Plaintiff that things were not working out because of his accent and that he and the other Defendant [Doctors] were concerned about his . . . accent."   (Id. ¶ 59.)   Mydlo threatened that if Plaintiff complained about the discriminatory evaluations and his termination to any grievance committee or in a lawsuit, "that would be the end of Plaintiff's career."   (Id. ¶ 60.)

In July 2012, Plaintiff complained to TUH's Designated Institutional Official ("DIO"), Susan Coull, about Defendants' failure to follow TUH's and ACGME's policies and procedures concerning evaluations, which, inter alia, require timely, quarterly objective evaluations of residents, as well as an opportunity for residents to respond to adverse evaluations.   (Id. ¶ 61; see also id. ¶¶ 47, 49, 50, 52.)   He also complained about the discriminatory treatment he received during his residency.   (Id. ¶ 61.)   Although Plaintiff had already been informed that he was being terminated from the residency program, Coull suggested to Plaintiff that he could resign from the program in exchange for a letter of recommendation, and Plaintiff agreed to that procedure.   (Id. ¶¶ 62-63.)   On August 10, 2012, Mydlo emailed Plaintiff and confirmed that he would write a recommendation letter once Plaintiff sent in his resignation.   (Id. ¶ 64.)   Plaintiff submitted his resignation letter by email on August 13, 2012.   (Id. ¶ 65.)   After receiving Plaintiff's email,

3

Mydlo requested revisions to the resignation letter, and Plaintiff submitted a revised letter on August 16, 2012.  (Id. ¶¶ 66-67.)   However, Mydlo has never provided Plaintiff with a positive recommendation letter.  (Id. ¶ 68.)

Moreover, since Plaintiff's resignation from TUH, his applications for other urology residency programs have been rejected.  (Id. ¶ 69.)   Plaintiff believes they have been rejected because Mydlo has been providing negative feedback regarding Plaintiff.  (Id. ¶ 70.)   Mydlo has also failed to respond to emails requesting letters of recommendation, which are required for program applications.  (Id. ¶ 72.)   On July 13, 2013, Mydlo falsely reported to the Federation of State Medical Boards that Plaintiff was a PGY-1 resident at TUH for the 2011/2012 academic year and that TUH had placed him on probation.  (Id. ¶¶ 73-74.)

Plaintiff filed the instant action on March 27, 2015.   The Complaint asserts claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981, based on Plaintiff's termination (Count I), the denial of PGY-4 credit (Count II), his pretextual performance evaluations (Count III), hostile work environment (Count IV), the wrongful termination of his PGY-5 contract (Count V), Mydlo's failure to provide a letter of recommendation (Count VI), and Mydlo's reporting of false and defamatory information to the State Medical Board (Count VII).   It also asserts state law claims against TUH for breach of contract (Counts VIII and IX), and against TUH and Mydlo for defamation (Count X), as well as an alternative claim against all Defendants under 41 U.S.C. § 1983 should any Defendant be deemed a state actor (Count XI).

## II.    LEGAL STANDARD

When considering a motion to dismiss pursuant to Rule 12(b)(6), we "consider only the complaint, exhibits attached to the complaint, [and] matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon these documents." Mayer v. Belichick, 605 F.3d 223, 230 (3d Cir. 2010) (citing Pension Benefit Guar. Corp. v. White

Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993)).   We take the factual allegations of the complaint as true and draw all reasonable inferences in favor of the plaintiff.   DelRio-Mocci v. Connolly Props., Inc., 672 F.3d 241, 245 (3d Cir. 2012) (citing Warren Gen. Hosp. v. Amgen, Inc., 643 F.3d 77, 84 (3d Cir. 2011)).   Legal conclusions, however, receive no deference, as the court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'"   Wood v. Moss, 134 S. Ct. 2056, 2065 n.5 (2014) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

A plaintiff's pleading obligation is to set forth "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), which gives the defendant "'fair notice of what the . . . claim is and the grounds upon which it rests.'"   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).   The complaint must contain "'sufficient factual matter to show that the claim is facially plausible,' thus enabling 'the court to draw the reasonable inference that the defendant is liable for [the] misconduct alleged.'"   Warren Gen. Hosp., 643 F.3d at 84 (quoting Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009)).   "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not 'show[n]' - 'that the pleader is entitled to relief.'"   Iqbal, 556 U.S. at 679 (alteration in original) (quoting Fed. R. Civ. P. 8(a)(2).   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."   Id. 678 (citing Twombly, 550 U.S. at 556).   In the end, we will grant a motion to dismiss brought pursuant to Rule 12(b)(6) if the factual allegations in the complaint are not sufficient "'to raise a right to relief above the speculative level.'"   W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank, 712 F.3d 165, 169 (3d Cir. 2013) (quoting Twombly, 550 U.S. at 555).

### III.    DISCUSSION

Defendants argue that we should dismiss the § 1981 claims in Counts I through VII of the Complaint because the factual allegations do not support any claim of race discrimination under the federal statute.    In the alternative, they argue that we should dismiss the § 1981 race discrimination and retaliation claims against the Defendant Doctors in Counts I, II, III, and V, because the Complaint does not adequately allege certain elements of such claims.[2]    They also argue that we should dismiss the § 1981 hostile work environment claim against all Defendants in Count IV, because the Complaint does not allege severe and pervasive discrimination.    Finally, they argue that, after dismissal of the § 1981 claims, we should dismiss the state law claims in Counts VIII, IX, and X for lack of supplemental jurisdiction.

### A.    All Claims Pursuant to 42 U.S.C. § 1981

Defendants argue that Counts I through VII of the Complaint assert national origin discrimination based on Plaintiff's accent, which is not actionable under § 1981.   Section 1981, by its terms, prohibits nongovernmental discrimination in the making and enforcement of contracts.   See 42 U.S.C. § 1981.   Specifically, it provides, in pertinent part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

Id. § 1981(a).   "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."   St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987) (citing Runyan v.

---

[2] Defendants also argue that we should dismiss Count IV on this basis, but because we only read Count IV to assert a hostile work environment claim, not additional claims for race discrimination and retaliation, we address it separately.

McCrary, 427 U.S. 160, 168 (1976)).   By prohibiting race discrimination, § 1981 also "protect[s] from discrimination identifiable classes of persons who are subjected to intentional discrimination solely because of their ancestry or ethnic characteristics."   Id. at 613; see also Mulholland v. Classic Mgmnt. Inc., Civ. A. No. 09–2525, 2010 WL 2470834, at *2 (E.D. Pa. June 14, 2010) (citing St. Francis Coll., 481 U.S. at 613).   It does not, however, protect against discrimination based on one's place of birth or national origin.   See Broom v. Saints John Neumann & Maria Goretti Catholic High Sch., 722 F. Supp. 2d 626, 631 (E.D. Pa. 2010) ("Because § 1981 was intended to protect against discrimination based on race, it does not provide a remedy to plaintiffs discriminated against 'solely on the place or nation of [their] origin.'" (alteration in original) (quoting St. Francis Coll., 481 U.S. at 613), and citing Bennun v. Rutgers State Univ., 941 F.2d 154, 172 (3d Cir. 1991))).   Accordingly, only if a plaintiff "can prove that he was subjected to intentional discrimination based on the fact that he was born [into a particular ethnic group], rather than solely on the place or nation of his origin, . . . [will he] have made out a case under § 1981." St. Francis Coll., 481 U.S. at 613.

The Complaint in this case alleges that Plaintiff is an Eastern Indian, dark-skinned male who was born in India and has a discernible Indian accent.   (Compl. ¶ 18 and n.3.)   It further alleges that "Plaintiff was subjected to discriminatory treatment by Defendant [Doctors], because of his race, ancestry, ethnic and linguistic characteristics, including but not limited to being subjected to discriminatory comments and jokes about his accent and being openly told by Defendant Mydlo that the other Defendant [Doctors] were hesitant to have him work with their patients because of his accent."   (Id. ¶ 36; see also id. ¶ 59 (reiterating that Mydlo had "informed Plaintiff that things were not working out because of his accent and that he and the other Defendant [Doctors] were concerned about his . . . accent")).   In addition, the Complaint alleges that Plaintiff complained about "the discriminatory behavior that he was being subjected to because of his race

and ethnic/linguistic characteristics (particularly his accent)."   (Id. ¶ 55; see also id. ¶ 56 (alleging that Plaintiff continued to complain that "he was being discriminated against because of his race and ethnic/linguistic characteristics").

Defendants argue that, without more, these allegations do not support a claim of race discrimination but, rather, only support a claim of national origin discrimination, which is not cognizable under § 1981.   More specifically, they argue that discrimination based on one's accent, which is the only factually specific basis for discrimination alleged in the Complaint, cannot support a claim of race discrimination.   In support of this assertion, Defendants primarily rely on Kamara v. Horizon House, Inc., Civ. A. No. 13-6728, 2015 WL 9260031 (E.D. Pa. Dec. 18, 2015).   In Kamara, a black male of Liberian origin brought § 1981 claims against his former employer.   Id. at *1.   The record in that case included evidence that the plaintiff's supervisor said things like "Africans are lazy; all you Africans do is complain; Africans don't like to do any work;" that another supervisor told Plaintiff that Africans have heavy accents; and that the staff had trouble understanding them.   Id. at *2.   The Court concluded on summary judgment that the Plaintiff was not pursuing a claim based on racial discrimination, because he only asserted that he was "subjected to blatantly discriminatory comments about his accent and about the fact that he was born in Africa," which could not support a claim of racial discrimination.   Id. at *5 (quotations and citations omitted).   In the Court's view, "Plaintiff's accent is the result of being born outside the United States, not a result of his ethnic or ancestral origins."   Id.

Unlike Defendants, however, we do not read Kamara to dictate that an individual's accent can never be a product of an individual's ancestry or ethnic origins but, rather, we read it only to conclude that, in that particular case, the plaintiff's accent was "the result of being born outside of the United States, not a result of his ethnic or ancestral origins."   Id.   Indeed, "the line between discrimination based on 'ancestry or ethnic characteristics,' and discrimination based on 'place or

nation of . . . origin is not a bright one." St. Francis Coll., 481 U.S. at 614 (alteration in original) (Brennan, J., concurring) (citations omitted).   Accordingly, we conclude that, in at least certain circumstances, one's accent may be a characteristic of ethnicity as well as national origin.   See Gupta v. Sears, Roebuck & Co., Civ. A. No. 07-243, 2007 WL 2253609, at *3 (W.D. Pa. Aug. 3, 2007) (denying motion to dismiss § 1981 claim where the complaint alleged that plaintiff was a woman of color with a noticeable accent, which was "clearly evidence of her Indian ethnicity," and alleged discrimination based on plaintiff's having been "born an Indian, rather than solely on the place . . . or nation of her origin").   We further conclude that where, as here, the Complaint alleges that Plaintiff was subjected to discriminatory treatment "because of his race, ancestry, ethnic and linguistic characteristics, including but not limited to being subjected to discriminatory comments and jokes about his accent" (Compl. ¶ 36), it is premature to dismiss the claim based on a conclusion that the alleged discrimination was based on Plaintiff's place of birth rather than his Indian ethnicity and ancestry.   See Gupta, 2007 WL 2253609, at *3 (concluding that the plaintiff had adequately pled a § 1981 claim when she alleged that she was a native of India with a noticeable accent, of Indian origin, and a member of a protected class on account of her race); see also Abdul v. Gamesa Tech. Corp., Civ. A. No. 11-1946, 2012 WL 1344391, at *3 (E.D. Pa. April 18, 2012) (noting that "courts in this district have . . . permit[ted] claims based on national origin *and* race, ethnicity or ancestry to proceed," and only dismissed claims when they are "based: 1) solely on national origin, or 2) on national origin and other non-protected characteristics." (citations omitted)).   We therefore deny Defendants' Motion to Dismiss insofar as it seeks dismissal of Count I-VII on the basis that discrimination based on one's accent can never support a § 1981 claim.

9

B.     Race Discrimination Claims against Defendant Doctors

Defendants alternatively argue that we should dismiss Plaintiff's race discrimination claims against the Defendant Doctors in Counts I, II, III and V, because the Complaint fails to adequately allege that any of the Defendant Doctors acted with intent to racially discriminate against Plaintiff.  Generally, to state a race discrimination claim under § 1981, a plaintiff must plausibly allege that the defendant intended to discriminate against him on the basis of his race. Estate of Oliva ex rel. McHugh, 604 F.3d 788, 797 (3d Cir. 2010); Brown v. Philip Morris Inc., 250 F.3d 789, 797 (3d Cir. 2001).   Here, with regard to intent, the Complaint alleges that Mydlo informed Plaintiff that the Defendant Doctors were concerned about Plaintiff's accent and "that the . . . Defendant [Doctors] were hesitant to have [Plaintiff] work with their patients because of his accent."  (Compl. ¶¶ 36, 59.)   It also alleges that the Defendant Doctors made "discriminatory comments and jokes about [Plaintiff's] accent."  (Id. ¶ 36.)

According to Defendants, the allegations about discriminatory comments and jokes is too vague to support an inference of discriminatory intent as it does not allege "with particularity the comments made, indicate who made the comments and when."  See Grasty v. World Flavors, Inc., Civ. A. No. 11-1778, 2011 WL 3515864, at *6 (E.D. Pa. Aug. 11, 2011).  They further contend that the allegations regarding the Defendant Doctors' expressions of concern about Plaintiff's accent are, on their face, nothing more than expressions of justifiable apprehension that Plaintiff would be unable to effectively communicate with their patients, and thus the allegations, without more, are not sufficiently suggestive of an intent to racially discriminate.

As an initial matter, we reject Defendants' suggestion that there is some sort of heightened pleading requirement applicable to Plaintiff's § 1981 discrimination claims that requires those claims to be pled with "particularity," and we instead analyze Plaintiff's claims under the

established pleading standards of <u>Twombly</u> and <u>Iqbal</u>.[3]   Nevertheless, we conclude that there are no facts alleged in the Complaint that give rise to a reasonable inference that the Defendant Doctors had an intent to discriminate against Plaintiff on account of his race.   While the Complaint alleges that the Defendant Doctors made comments about Plaintiff's accent, there are no factual allegations that would support a reasonable inference that those comments were racially-motivated, rather than having the more benign purpose of indicating concern regarding Plaintiff's ability to communicate effectively with patients.   Likewise, while the Complaint alleges that Defendant Doctors made jokes about Plaintiff's accent, in the absence of any description of the alleged jokes, the Complaint simply does not contain "sufficient factual matter" to give rise to a reasonable inference that the jokes were racial, much less that the Defendant Doctors intended to discriminate against Plaintiff on account of his race by making the jokes. <u>Warren Gen. Hosp.</u>, 643 F.3d at 84.   Finally, while the Complaint alleges that the Defendant Doctors gave Plaintiff negative performance reviews, the mere issuance of negative reviews does not give rise to an inference of racially discriminatory intent.   We therefore conclude that the Complaint fails to allege facts that "raise a right to relief above the speculative level."   <u>W. Run Student Hous. Assocs.</u>, 712 F.3d at 169 (quotation omitted).   Consequently, we grant Defendants' Motion insofar as it seeks dismissal of the race discrimination claims against the Defendant Doctors in Count I, II, III and V based on insufficient allegations of racially discriminatory intent.

   C.   Retaliation Claims against Defendant Doctors

   Defendants also argue that we should dismiss Plaintiff's retaliation claims against the Defendant Doctors in Counts I, II, III and V, because the Complaint fails to state retaliation claims

---

[3]   Indeed, "[t]he Supreme Court has rejected a heightened pleading standard for civil rights cases in general, <u>see Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit</u>, 507 U.S. 163, 168-69 (1993), and employment discrimination cases in particular.   <u>See Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 511 (2006)."   <u>Grigsby v. Pratt & Whitney Amercon, Inc.</u>, Civ. A. No. 07-0785, 2008 WL 471549, at *8 (M.D. Pa. Feb. 19, 2008).

against the Defendant Doctors upon which relief can be granted.   To state a cognizable retaliation claim under § 1981, a plaintiff must allege that: 1) he "engaged in a protected employee activity; 2) the employer took an adverse employment action [against him] after or contemporaneous with [his] protected activity; and 3) a causal link exists between the employee's protected activity and the employer's adverse action."   Abramson v. William Paterson Coll., 260 F.3d 265, 286 (3d Cir. 2001); Estate of Oliva, 604 F.3d at 798 (citing Moore v. City of Philadelphia, 461 F.3d 331, 340-41 (3d Cir. 2006)); see also id. 798 n.14.   Defendants argue that the Complaint does not adequately allege that Plaintiff engaged in protected activity prior to or contemporaneous with an adverse employment action but, rather, only specifically alleges that Plaintiff complained about discrimination in July of 2012, after he was terminated from the residency program.   They further argue that, even assuming arguendo that the Complaint does allege qualifying protected activity, it does not allege a cognizable retaliation claim against the Defendant Doctors because it does not allege that the Defendant Doctors were responsible for, or involved in, Plaintiff's termination.

However, contrary to Defendants' assertion, the Complaint specifically alleges that prior to his May 2012 performance evaluation, Plaintiff complained to TUH's management about racially discriminatory behavior.   (Compl. ¶ 55.)   Likewise, the Complaint also alleges that the Defendant Doctors "had control over the terms and conditions of Plaintiff's employment," "participat[ed] in the decision to terminate Plaintiff," and "personally participated in Plaintiff's pretextual performance evaluations."   (Id. ¶¶ 8-15, 93.)   Under these circumstances, we reject Defendants' arguments that the Complaint has failed to state cognizable retaliation claims against the Defendant Doctors, and we deny their Motion insofar as it seeks dismissal of the retaliation claims against the Defendant Doctors.

D.     Hostile Work Environment

Defendants argue that we should dismiss the hostile work environment claim in Count IV because the Complaint fails to state a hostile work environment claim upon which relief can be granted.   To state a cognizable racially hostile work environment claim, a plaintiff must allege that (1) he suffered intentional discrimination, (2) "the discrimination was severe or pervasive," (3) the discrimination detrimentally affected the plaintiff, (4) the discrimination would have affected a reasonable person in the same position, and (5) "there is a basis for employer liability."[4] Hanzer v. Mentor Network, 610 F. App'x 121, 126 (3d Cir. 2015) (citation omitted); see also West v. Philadelphia Elec. Co., 45 F.3d 744, 753 (3d Cir. 1995).   "A hostile work environment exists when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"   Boyer v. Johnson Matthey, Inc., Civ. A. No. 02-8382, 2005 WL 35893, at *12 (E.D. Pa. Jan. 6, 2005) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 116 (2002)).   In assessing whether workplace discrimination is sufficiently severe or pervasive to support a § 1981 hostile work environment claim, we consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."   Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998) (quotation omitted). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not alone give rise to a hostile work environment.   Id. at 788 (quotation omitted).

---

[4]   "The elements of a racially hostile work environment are the same under Title VII and § 1981," Griffin v. Harrisburg Prop. Servs., Inc., 421 F. App'x 204, 207 n. 3 (3d Cir. 2011) (citations omitted), and, likewise "[t]he analysis of whether a hostile work environment exists is the same under [the two statutes]."   Boyer v. Johnson Matthey, Inc., Civ. A. No. 02-8382, 2005 WL 35893, at *12 n.17 (E.D. Pa. Jan. 6, 2005) (citations omitted)).

Defendants argue that the Complaint fails to state a cognizable hostile work environment claim because it does not allege facts that give rise to an inference of "severe or pervasive" offensive conduct.   Plaintiff maintains, however, that the Complaint adequately alleges a severe and pervasive discriminatory environment because it alleges that (1) the Defendants Doctors made comments and jokes about his accent, (2) Mydlo told him that the Defendant Doctors did not want him to work with their patients because of his accent, and (3) after complaining about discriminatory treatment, he was given poor performance evaluations, denied credit for an entire year of his residency, and denied a promotion.   (See Compl. ¶¶ 36, 55, 86, 90, 101.)   There are no additional allegations, however, concerning the frequency of the allegedly discriminatory "comments and jokes," or the actual substance of the comments and jokes, including whether they involved physical threats, and there are no allegations that give rise to a reasonable inference that the workplace environment "unreasonably interfered with [Plaintiff's] work performance." Faragher, 524 U.S. at 787–88.   Indeed, far from alleging that the environment interfered with Plaintiff's work performance, the Complaint alleges that Plaintiff's work performance was "superior" and that he amassed numerous academic and work achievements.   (Compl. ¶ 97; see also id. ¶¶ 32-35.)   Moreover, in spite of alleging that the Defendant Doctors did not want him to work with his patients because of his accent, there is no allegation that the work he was assigned was affected as a result of the Defendants Doctors' alleged preferences.   Finally, there are simply no allegations that suggest that the workplace was "permeated with discriminatory intimidation, ridicule, and insult" or was otherwise "abusive."   Boyer, 2005 WL 35893, at *12.   Under these circumstances, we conclude that the Complaint does not plausibly allege a workplace environment with "severe and pervasive" discrimination.   We therefore grant Defendants' Motion insofar as it seeks dismissal of the hostile work environment claim in Count IV of the Complaint.

**IV.     CONCLUSION**

For the foregoing reasons, we grant Defendants' Motion with respect to Count IV's hostile work environment claim, and also grant the Motion with respect to the claims for race discrimination against the Defendants Doctors in Counts I, II, III, and V.   We deny the Motion in all other respects, including insofar as it seeks dismissal of the state law claims in Counts VIII, IX, and X, as Defendants' sole argument for the dismissal of those claims was that we should decline to exercise supplemental jurisdiction if we dismissed all of Plaintiff's federal claims.

We also, however, grant Plaintiff leave to amend the hostile work environment claim in Count IV and the race discrimination claims against the Defendants Doctors in Counts I, II, III, and V.   "[I]f a complaint is subject to a Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile."   Phillips v. Cty. of Allegheny, 515 F.3d 224, 245 (3d Cir. 2008) (citing Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004).   Here, we are simply not convinced that amendment of these claims would be either futile or inequitable and, thus, we give Plaintiff the opportunity to amend the dismissed claims.

An appropriate Order follows.

BY THE COURT:


/s/ John R. Padova, J.
_____
John R. Padova, J.

15