IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RAO MANDALAPU, M.D.          :        CIVIL ACTION
                              :
          v.                :
                              :
TEMPLE UNIVERSITY HOSPITAL, :
INC., ET AL.                    :        NO. 15-5977

**MEMORANDUM**

**Padova, J.**                                             **July 5, 2018**

Plaintiff Rao Mandalapu, M.D. filed this employment discrimination action against Defendant Temple University Hospital ("TUH"), Dr. Jack H. Mydlo, and several other doctors at TUH (the "Defendant Doctors"), after he was terminated from TUH's urology residency program. Defendants have filed a Motion for Summary Judgment. For the following reasons, we grant Defendants' Motion.

I.    **BACKGROUND**

The facts in the summary judgment record are as follows. Plaintiff Rao Mandalapu was born in India. (Concise Statement of Stipulated Facts ("Stip. Facts") ¶ 5.) Plaintiff was board certified in general surgery in India in 1996. (Id. ¶ 25.) He moved to the United States in 2002 and became a United States citizen in 2009. (Id. ¶ 26.) Because his foreign medical training was not recognized in the United States, Plaintiff had to undergo a three-part medical license exam and complete a residency in the United States in order to practice medicine here. (Pl.'s Dep., Defs.' Ex. 1, at 44-45.) From 2003 to 2004, he pursued a residency in the Department of Surgery, SUNY-Stony Brook Hospital. (Stip. Facts ¶ 27.) While in that program, he decided to pursue a specialty in urology. (Pl.'s Dep. at 47-48.)

To obtain board certification from the American Board of Urology, a doctor must undergo five clinical years of post-graduate medical training that includes one year of general surgery training and four years in a urology program approved by the American Council for Graduate Medical Education ("ACGME"). (Defs.' Ex. 33 at 1.) Plaintiff's one year at Stony Brook satisfied his first year of urology certification training, that is, his "PGY-1" in surgery. (See Pl.'s Dep. at 46-47, 55.) To then burnish his credentials for application for a urology program, from July 2004 to June 2006, Plaintiff served as a men's health fellow in the Department of Urology at Brown University. (Pl.'s Dep. at 49-50; Stip. Facts ¶ 28.)

Plaintiff subsequently applied and was accepted to the urology residency program in the Department of Urology at Ohio State University, which he attended from July 2007 to June 2009, satisfying his second and third post-graduate residency years ("PGY-2" and "PGY-3"). (Stip. Facts ¶ 29; Pl.'s Dep. at 55, 60.) In January 22, 2008, the Chair of the Urology Department at Ohio State, Dr. Robert Bahnson, authored a memorandum in which he recounted that he had met with Plaintiff to discuss concerns with Plaintiff's performance in the program. (Defs.' Ex. 6; Defs.' Ex. 7 at 2.) Among those concerns were that Plaintiff was lagging behind the other two residents in the program, seemed incapable of performing simple repetitive tasks independently even when given explicit directions, and had scored "quite low" on his in-service examinations. (Defs.' Ex. 6.) In May of 2008, Dr. Bahnson, wrote to Plaintiff to inform him that the urology faculty had collectively voted to place him on probation. (Defs.' Ex. 7 at 1.) Dr. Bahnson stated in the letter that Plaintiff's acquisition of technical skills fell "far short of what one would anticipate for a . . . trainee at [his] level," making the faculty "quite concerned about [his] future promise to attain proficiency at more complex and challenging technical surgical procedures." (Id.) Dr. Bahnson further stated that the faculty was concerned that he had problems with his

"cognitive fund of knowledge in urology," and that he had an inability to use his medical knowledge and the facts before him to formulate a treatment plan for a patient. (Id.) Finally, Dr. Bahnson relayed that the faculty's greatest concern was that Plaintiff was not responsible and accountable. (Id. at 1.) He warned Plaintiff that any further lapse in professional responsibility would be grounds for immediate expulsion from the program and that, if the faculty did not see substantial progress in the deficiencies noted, Plaintiff would not be promoted to the PGY-4 year. (Id.) In Plaintiff's bi-annual review the following month, Dr. Bahnson reiterated the concerns in the May letter, and added that one of Plaintiff's problems was communication as he is both soft-spoken and has difficulty with pronunciation of the English language. (Defs.' Ex. 8.) Dr. Bahnson stated that he believed that some of the issues related to Plaintiff's performance "are owing to the fact that people and patients cannot truly understand him when he speaks." (Id.)

On December 15, 2008, Plaintiff formally resigned from the program at Ohio State, effective the end of his academic year in 2009. (Stip. Facts ¶ 30; Defs.' Ex. 9.) Plaintiff explained his resignation by stating that he felt like he was too "distracted" given that his wife was living in New York and his son was living in California. (Defs.' Ex. 9.) At Plaintiff's bi-annual review on January 5, 2009, Dr. Bahnson noted that Plaintiff had shown improvement in his in-service examination scores, but that his clinical and operative skills were still not "at a level that [Dr. Bahnson] would expect from an individual at a PGY3 . . . level." (Defs.' Ex. 10.) At the conclusion of Plaintiff's PGY-3 year, in June of 2008, Dr. Bahnson recommended him for further urologic training "with reservation." (Defs.' Ex. 11.) Dr. Bahnson observed that Plaintiff's interpersonal and communication skills were "adequate," and would be "much better were it not for the fact that he has a very soft voice and his accent sometimes makes it difficult for people to understand him." (Id.)

In the Spring of 2011, Plaintiff accepted a position in the urology residency program at Defendant TUH, with a start date in July 2011. (Stip. Facts ¶ 31.) He served as a resident transfer in the Temple Urology residency program from July 2011 through July 2012, working on his fourth post-graduate year ("PGY-4"). (Id. ¶¶ 6, 32.) Defendant Dr. Mydlo was the director of that program as well as the Chair of the Department of Urology at TUH. (Id. ¶ 8.) In the program, Plaintiff rotated among TUH; Abington Memorial Hospital, which is affiliated with the Temple program; and Fox Chase Cancer Center ("FCCC"), which is a comprehensive care center within the Temple University Health System. (Id. ¶¶ 3, 7, 33.) Defendants Dr. Richard E. Greenberg (FCCC), Dr. David Y.T. Chen (FCCC), Dr. Alexander Kutikov (FCCC), Dr. Robert Guy Uzzo (FCCC), Dr. Robert Charles (Abington), Dr. Steven Hirshberg (Abington), and Dr. Yan F. Shibutani (Abington) were all teaching faculty in the urology residency program. (Id. ¶¶ 10, 11, 13, 15, 17, 19, 21, 23.)

The terms of Plaintiff's appointment to the program were set forth in an agreement dated May 9, 2011, but executed on July 21, 2011. (Defs.' Ex. 14.) The agreement specified that it covered the term of July 21, 2011 through July 20, 2012, and that Plaintiff's continuation in the program would be "based upon the evaluations of [his] Program Director, preceptors and the discharge of [his] responsibilities." (Id.) It further stated that his Program Director, who was Dr. Mydlo, would inform him, no less than four months before the end of his training year if his appointment would be terminated or if he would continue in the program at the same PGY level. (Id.)

During the course of his PGY-4 year, Plaintiff performed 638 surgical procedures, and was assigned as the "surgeon" for all but thirteen of those procedures. (Pl.'s Ex. Mydlo 40.) Approximately three months into his training year, on October 28, 2011, Ryan Fogg, a urology

resident who was senior to Plaintiff, prepared an email documenting a discussion that she had with Plaintiff, which was prompted by Plaintiff's failure to realize that "a fresh post op prostatectomy patient had new onset hematuria." (Defs.' Ex. 15; Pl.'s Dep. at 198-99.) Fogg reported that "when asked about [the mistake] directly, . . . [Plaintiff] reported that the urine was clear." (Defs.' Ex. 15.) Fogg documented that she reminded Plaintiff that "this was the fourth occurrence of [its] kind and that [Fogg] was concerned that there is a pattern of inattentiveness and dishonesty or poor communication that is not improving despite [her] repeated attempts to address this issue w/ him."[1] (Id.)

All of the doctors who supervised Plaintiff subsequently completed evaluations of Plaintiff's work. Dr. Mydlo's review for the period of July 1, 2011 to October 31, 2011 reflected that Plaintiff was deficient in several categories, including overall clinical competence, ability to make informed recommendations about options, and using evidence based medicine to effectively manage patient care. (Defs.' Ex. 17 at 1-2.) He rated Plaintiff as "unsatisfactory" in "establish[ing] rapport with patients and families thru listening, narrative & nonverbal skills," and also wrote that Plaintiff "has a significant communication barrier that makes it difficult to understand and comprehend orders." (Id.) Dr. Mydlo further noted that he had told Plaintiff "a number of times that he needs to increase his compulsiveness for patient care" and further wrote that he would "carefully monitor [Plaintiff's] performance over the next few months." (Id. at 2.)

For that same time period (July 1 to October 31, 2011), Dr. Hirshberg graded Plaintiff's performance as marginal in the vast majority of reviewed categories. (Defs.' Ex. 20 at 1-2.) He also noted on his evaluation that Plaintiff "struggles with the English language which is a barrier between him and hospital staff" and that he needs to be more aware of the language barrier and

---

[1] At his deposition, Mandalapu denied that Fogg had any discussion with him and asserted that the contents of the memo that Fogg prepared were false. (Pl.'s Dep. at 202-03.)

make a stronger effort to ensure that he is understood." (Id. at 3.) Dr. Shibutani primarily rated Plaintiff's performance during that time as "approaching expected" and "expected," noting that Plaintiff had a "willingness to listen," but had room for improvement in "efficient[ly] managing problems and service[,] . . . work[ing] quickly and independently[,] . . . [and] tak[ing] initiative and lead as a senior resident." (Defs.' Ex. 19 at 3-4.) While Dr. Mydlo reported that Plaintiff was not on track to pass the ABIM certification exam, Dr. Hirshberg and Dr. Shibutani opined that Plaintiff was on track. (Defs.' Ex. 17 at 1; Defs.' Ex. 19 at 3; Defs.' Ex. 20 at 1.)

Several doctors completed evaluations of Plaintiff for the period of November 1, 2011 through February 29, 2012: Dr. Charles, Dr. Shibutani, Dr. Hirshberg, Dr. Greenberg, Dr. Kutikov, and Dr. Chen. Dr. Charles concluded that Plaintiff had completed his rotation "satisfactorily," reported that Plaintiff had mostly performed as "expected" or "approaching expected," and was even "very good" at "demonstrate[ing] maturity, motivation, [and] honesty" and "evaluat[ing] his own performance and utiliz[ing] feedback to improve [his] performance." (Defs.' Ex. 18 at 2.) He identified Plaintiff's principal strengths as being caring and "[t]rying hard to improve," and opined that Plaintiff could improve by increasing his outside reading to increase his fund of urologic knowledge. (Id. at 3.) Like Dr. Charles, Dr. Shibutani concluded that Plaintiff had completed his rotation "satisfactorily," and mostly rated Plaintiff's performance as "approaching expected" or as expected. (Defs.' Ex. 19 at 1-2.) He rated Plaintiff marginal in two categories: establishing rapport with patients and families, and "[a]wareness and use of practice guidelines . . . and effective utilization of hospital resources to achieve appropriate patient care." (Id.) Dr. Shibutani identified Plaintiff's strengths as "remain[ing] even tempered and "well read about certain areas," and stated that Plaintiff could improve with regard to "succinct

directives to ancillary staff seems to be a communication gap" and "more assertive behavior and efficiency in completing tasks."   (Id. at 2.)

Dr. Hirshberg, as he did in his first evaluation, again evaluated Plaintiff as marginal in many categories, indicated that he was deficient both in demonstrating maturity, motivation and honesty, and also in his awareness of and use of practice guidelines, and he rated Plaintiff as "unsatisfactory" in establishing rapport with patients and families.   (Defs.' Ex. 20 at 4-6.)   While Dr. Hirshberg wrote that Plaintiff had "a reasonable knowledge of basic urologic tenets," he also wrote that he was concerned about Plaintiff's honesty and that he feared that Plaintiff used his problems with the English language as "cover for his clinical inadequacies."   (Id. at 6.)   Dr. Greenberg primarily rated Plaintiff's performance during this time period as marginal or "approaching expected" and, overall, reported that Plaintiff's rotation was completed "marginally."   (Defs.' Ex. 21 at 1-2.)

Dr. Kutikov rated Plaintiff as marginal in five categories, approaching expected in one category, expected in five categories, and very good in maturity, motivation and honesty.   (Defs.' Ex. 22.)   He wrote:

> Rao requires much improvement in his clinical judgment, communication skills, and attention to detail.   He has trouble "rolling with the punches" on a busy clinical service and needs to develop better judgement [sic] on when to act independently and when to ask for help.   Many dropped balls happen because communication skills are sub-par.   In truth, I still feel uncomfor[t]able when Rao takes care of my patients independently.   He has improved, but still has a "ways to go."

(Id. at 3.)   Dr. Chen commented that Plaintiff "appears to be interested in completing his responsibilities well, but his performance generally does not match his level of interest" and "he commonly falls short of meeting normal clinical responsibilities."   (Defs.' Ex. 24 at 2.)   Dr. Chen further noted that Plaintiff exhibited:

a concerning lack of general clinical management knowledge, such as: 1) unclear ability to perform an evaluation for a post-operative fever; 2) needs better sense of surgery − movements are too large, exerts too much force during delicate aspects of a procedure[;] 3) does not demonstrate a satisfactory understanding of surgical instruments or steps, in even rudimentary procedures (ie, how to assemble a cystocope v. resectoscope), far below expected for his level of training.

(Id.)  Dr. Chen rated Plaintiff as "unsatisfactory" or "deficient" in seven different categories.

(Id. at 1-2.)

Dr. Greenberg concluded for the evaluation period of March 1, 2012 through June 30, 2012, that Plaintiff's rotation performance was "deficient," evaluating him either "unsatisfactory," "deficient" or marginal in all of the specific categories.   (Defs.' Ex. 21 at 3-4.)   He also noted that Plaintiff needed improvement in "interpersonal communications with hospital staff[,] Surgical ability[, and] Clinical Judgement [sic]."   (Id. at 4.)   Dr. Chen concluded for that same time period that Plaintiff "follows explicitly stated order/directions satisfactorily" but shows "no initiative in increasing responsibility/autonomy in the overall management of patients." (Defs.' Ex. 24 at 5.) He further observed that Plaintiff was "[i]nadequate in taking criticism/comments/ recommendations and changing his behavior or response for future situations," and that he "repeats errors and mistakes and fails to listen and implement recommended points needing improvement/correction."   (Id.)   Dr. Chen rated Plaintiff as "unsatisfactory" in almost all of the specific categories.   (Id. at 3-4.)

On April 10, 2012, TUH sent Plaintiff a contract for the PGY-5 year.   (Defs.' Ex. 27.) Although Dr. Mydlo had signed that contract, it was not signed by Susan Coull, the Associate Hospital Director, Graduate Medical Education, whose signature was also anticipated.   (Id.) Plaintiff signed the contract for the PGY-5 year on April 30, 2012.   (Id.)

On May 24, 2012, Plaintiff received and reviewed a copy of his "Quarterly Evaluation," which was dated April 16, 2012 and authored by Dr. Mydlo. (Defs.' Ex. 26.) The evaluation was a summation of a faculty meeting held on April 9, 2012. (Mydlo Dep., Defs.' Ex. 5 and Pl.'s Ex. 2, at 146.) Dr. Mydlo states in the evaluation that the faculty at TUH and Abington "feel[] that although you have improved somewhat over the year, there are still problems with communication, patient management, and surgical ability." (Defs.' Ex. 26.) He further states that "[t]he faculty feels you try very hard . . . , however they have not seen significant improvement that makes them feel comfortable in promoting you to the next level." (Id.) In addition, Dr. Mydlo states that Dr. Greenberg, in particular, "does not feel you are competent enough to manage the complicated patients at Fox Chase" and that other faculty feel that he is "not on track to finish the program successfully."[2] (Id.) Dr. Mydlo therefore advised Plaintiff that he "must consider other options to pursue for [his] future." (Id.)

On June 6, 2012, Dr. Mydlo sent a memorandum to Plaintiff, reiterating many of the points in the April 16 memo, and stating that Plaintiff's performance for the PG-4 year was unsatisfactory and that, as a result, he was "not being promoted and [his] contract [was] not being renewed." (Defs.' Ex. 28 at 2.) Dr. Mydlo testified that he had considered the information that he obtained from the faculty members, but that the ultimate decision not to promote Plaintiff was his own. (Mydlo Dep. at 54-55; see also Greenberg Dep., Defs.' Ex. 2, at 43-44.) In order to provide Plaintiff with four months' notice from the end of his contract period, Dr. Mydlo stated that the termination would be effective November 19, 2012. (Defs.' Ex. 28 at 2.)

---

[2] Dr. Greenberg testified at his deposition that he did not feel that Plaintiff was competent enough to become a chief resident, which is the role of a PGY-5 resident. (Defs.' Ex. 2 at 62, 81.) He recounted that, towards the end of Plaintiff's PGY-4 term, Plaintiff made several mistakes that "led to significant injury to several patients." (Id. at 78-79.)

TUH subsequently gave Plaintiff the opportunity to resign from the program. (See Defs.' Ex. 29.) Dr. Mydlo also offered to provide Plaintiff with a letter stating his positive qualities, e.g., that he is hard working and intelligent, and to speak to other programs to which Plaintiff wished to apply. (Id.) On August 18, 2012, Plaintiff sent Dr. Mydlo a resignation letter that was dated May 20, 2012, and stated that he was resigning "effective July 20, 2012 due to family circumstances." (Defs.' Ex. 30.)

In July of 2013, Dr. Mydlo completed a "Verification of Graduate Medical Education" form concerning Plaintiff for the Federation of State Medical Boards. (Defs.' Ex. 32.) On the form, he reported that Plaintiff was "Training Level:1," answered "yes" to the question of whether Plaintiff had ever been placed on probation, and wrote that Plaintiff "wasn't performing at the expectations of the residents or the faculty." (Id.) At his deposition, Dr. Mydlo could not recall whether Plaintiff had been placed on formal probation; he only recalled having advised Plaintiff that his evaluations were "not going well" and that he was "not going to finish the program." (Mydlo Dep. at 216.)

On December 5, 2013, Dr. Mydlo provided Plaintiff with a letter of recommendation in connection with Plaintiff's application for a position in the urology program at Icahn School of Medicine at Mount Sinai. (Pl.'s Ex. Mydlo 25.) That letter states that Plaintiff "displayed good work ethic," "demonstrated good surgical technique in the operating room," was "personable and easy-going," and scored very highly on his AUA In-Service exam. (Id.) It further states that Plaintiff showed "determination and perseverance to become an urologist" and that Dr. Mydlo was sure that Plaintiff would work his best to become an asset to the Mt. Sinai program. (Id.) However, in fact, Plaintiff is no longer able to obtain a certification in urology because the American Board of Urology only allows a certification applicant to participate in two residency

programs. (Mydlo Dep. at 247; American Bd. of Urology Residency Requirements, Defs.' Ex. 33, at 1 ("A resident may only transfer once during the urology portion of training . . . .").)

The First Amended Complaint asserts claims of race discrimination and retaliation pursuant to 42 U.S.C. § 1981, based on Plaintiff's termination (Count I), the denial of PGY-4 credit (Count II), his performance evaluations (Count III), hostile work environment (Count IV), the wrongful termination of his PGY-5 contract (Count V), Dr. Mydlo's failure to provide a letter of recommendation (Count VI), and Dr. Mydlo's reporting of false and defamatory information to the State Medical Board (Count VII). It also asserts state law claims against TUH for breach of contract (Counts VIII and IX), and against TUH and Dr. Mydlo for defamation (Count X), as well as an alternative claim against all Defendants under 41 U.S.C. § 1983 should any Defendant be deemed a state actor (Count XI).[3]

## II.    LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248 (1986). A factual dispute is "material" if it "might affect the outcome of the suit under the governing law." Id. In ruling on a summary judgment motion, we consider "the facts and draw all reasonable inferences in the light most favorable to . . . the party who oppose[s] summary judgment." Lamont v. New Jersey, 637 F.3d 177, 179 n.1 (3d Cir. 2011) (citing Scott v. Harris, 550 U.S. 372, 378 (2007)). If a reasonable fact finder could find in the nonmovant's favor, summary judgment

---

[3]    Neither party has asserted that Defendants are state actors, and Plaintiff conceded at oral argument that he is no longer pursuing his § 1983 claim. Accordingly, we do not address that claim any further.

may not be granted.  Congregation Kol Ami v. Abington Twp., 309 F.3d 120, 130 (3d Cir. 2002) (citation omitted).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court" that "there is an absence of evidence to support the nonmoving party's case."  Id. at 325. After the moving party has met its initial burden, the adverse party's response "must support the assertion [that a fact is genuinely disputed] by: (A) citing to particular parts of materials in the record . . . ; or (B) showing that the materials [that the moving party has cited] do not establish the absence . . . of a genuine dispute."  Fed. R. Civ. P. 56(c)(1).  Summary judgment is appropriate if the nonmoving party fails to respond with a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  "'While the evidence that the non-moving party presents may be either direct or circumstantial, and need not be as great as a preponderance, the evidence must be more than a scintilla.'"  Galli v. New Jersey Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007) (quoting Hugh v. Butler Cty. Family YMCA, 418 F.3d 265, 267 (3d Cir. 2005)).

## III.   DISCUSSION

### A.   Race Discrimination (§ 1981)

In Counts I, II, and V, Plaintiff claims that Defendants discriminated against him on the basis of his race in violation of § 1981 insofar as they terminated his enrollment in the TUH program, failed to give him credit for his PHY-4 year, and failed to promote him to his PGY-5

year.[4]  Defendants argue, inter alia, that Plaintiff has not established a prima facie case of discrimination with respect to these claims.

Section 1981, by its terms, prohibits discrimination in the making and enforcement of contracts.  See 42 U.S.C. § 1981.  Specifically, it provides, in pertinent part, as follows:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

Id. § 1981(a).  "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts."  St. Francis Coll. v. Al–Khazraji, 481 U.S. 604, 609 (1987) (citing Runyon v. McCrary, 427 U.S. 160, 168 (1976)).  We analyze race discrimination claims brought pursuant to Section 1981 under the same standard under which we analyze such discrimination claims under Title VII.  Carvalho-Grevious v. Delaware State Univ., 851 F.3d 249, 256-57 (3d Cir. 2017) ("The substantive elements of a [racial discrimination] claim under § 1981 are generally identical to the elements of an employment discrimination claim under Title VII.'") (alteration in original) (quoting Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009)).

---

[4]  In Counts III, IV, VI, and VII of the First Amended Complaint, Plaintiff asserted that Defendants also discriminated against him on the basis of his race in violation of § 1981 insofar as they issued pretextual performance evaluations, subjected him to a hostile work environment, failed to provide a letter of recommendation, and reported false information to the Federation of State Medical Boards.  However, Plaintiff does not argue in his response to Defendants' summary judgment motion that these actions constituted race discrimination.  Rather, he argues only that the performance evaluations and report to the Federation of State Medical Boards amounted to retaliation in violation of § 1981, addresses his hostile work environment claim as an independent claim, and does not address the letter of recommendation claim at all.  Accordingly, we conclude that Plaintiff is not pursuing his § 1981 claim regarding the letter of recommendation (Count VI); we address the claims concerning performance evaluations and the Federation of State Medical Board (Counts III and VII) as claims of retaliation only; and we address the hostile work environment claim as a distinct cause of action under § 1981.

To bring a successful discrimination claim, a plaintiff must prove that "an employer has 'treated [a] particular person less favorably than others because of' a protected trait . . . [and] 'that the defendant had a discriminatory intent or motive'. . . ." Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (first alteration in original) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 985-86 (1988)). In the absence of direct evidence of discriminatory intent, none of which is available in this case,[5] § 1981 discrimination claims are analyzed under the burden-shifting framework established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Kant v. Seton Hall Univ., 289 F. App'x. 564, 566 (3d Cir. 2008).

"Under McDonnell Douglas, the plaintiff bears the initial burden of demonstrating a prima facie case of unlawful discrimination . . . ." Dellapenna v. Tredyffrin/Easttown Sch. Dist., 449 F. App'x 209, 213 (3d Cir. 2011) (citing McDonnell Douglas, 411 U.S. at 802). In order to demonstrate a prima facie case of discrimination, Plaintiff must establish that:

> (1) [he] is a member of a protected class; (2) [he] was qualified for the position [he] sought to . . . retain; (3) [he] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination.

Makky v. Chertoff, 541 F.3d 205, 214 (3d Cir. 2008) (citations omitted).

In asking that we grant summary judgment in their favor on Plaintiff's race discrimination claims in Counts I, II, and V, Defendants do not dispute that Plaintiff, as an Indian male, is a member of a protected class or that he suffered adverse employment actions insofar as he was denied PGY-4 credit and not promoted to PGY-5. They argue, however, that the evidence in the record does not – and cannot – support conclusions that (1) he was qualified to receive credit for

---

[5] Plaintiff contends that the references to his accent in his performance evaluations constitute direct evidence of discrimination. However, as discussed below, we conclude that such evidence does not even give rise to an inference of discrimination. Accordingly, we necessarily also conclude that it does not constitute direct evidence of discrimination.

his PGY-4 year, be promoted to PGY-5, and continue in the TUH program, or (2) his lack of success in, and failure to be promoted within, the program occurred under circumstances that give rise to an inference of intentional discrimination.

Plaintiff argues that there are genuine issues of material fact both as to whether he was qualified to continue in the program and as to whether Defendants' actions occurred under circumstances giving rise to an inference of discrimination. In arguing that there is evidence to support a reasonable conclusion that he was qualified to continue in the TUH program, Plaintiff points to evidence that (1) Dr. Mydlo hired him at the outset, thereby plainly concluding at the time that he met the program's requirements (see Defs.' Exs. 12, 14; (2) Defendants permitted him to perform 638 surgeries during the course of his PGY-4 year, which was 100 more than the other PGY-4 resident in the program (see Pl.'s Ex. Mydlo 40); (3) TUH prepared and forwarded to Plaintiff a contract to advance him to his PGY-5 year (Defs.' Ex. 27); (4) not all of his performance reviews concluded that his performance was "unsatisfactory" or "deficient," but rather many deemed his skills to be "marginal," "approaching expectations," or even "expected" (see, e.g., Defs.' Ex. 18 at 2; Defs.' Ex. 19 at 1-4; Defs.' Ex. 20 at 1-2, 4-6; Defs.' Ex. 21 at 1-2), and (5) Dr. Mydlo wrote him a largely positive letter of recommendation in December of 2013 (Pl.'s Mydlo Ex. 25.)

He further asserts that he has put forth evidence to support a reasonable conclusion that Defendants' failure to give him PGY-4 credit year and promote him occurred under circumstances that give rise to an inference of intentional racial discrimination. In that regard, he relies on evidence that (1) more than one of his performance evaluations referenced his accent or difficulty with the English language (see, e.g., Defs.' Ex. 20 at 3, 6); (2) Dr. Mydlo admitted that one of the reasons that Plaintiff was not promoted was that he did not "communicat[e] effectively with the

residents and the faculty about patient care" and added that Plaintiff "would blame other nurses or the other residents that did not understand him" on account of his accent (Mydlo Dep. at 243); (3) of four other individuals who did not complete TUH's urology residency program, two were Indian (id. at 151-53, 155); (4) Defendants promoted the Caucasian PGY-4 fellow to his PGY-5 year in spite of that fellow scoring lower than Plaintiff on an American Urological Association in-service exam and, in fact, scoring so low that TUH's policy required him to be subjected to additional oversight until improvement was shown (id. at 234-35; Pl.'s Ex. Mydlo 2 at 5).)

We conclude that the evidence on which Plaintiff relies is simply insufficient to support a prima facie case of discrimination. As an initial matter, the evidence does not support a reasonable conclusion that he was qualified to receive credit for his PGY-4 year, to be promoted to his PGY-5 year, and to continue in the program. Indeed, the mere fact that he was admitted into the program does not support an inference that he was qualified to advance within the program. At oral argument, Plaintiff pointed to an email that Dr. Mydlo sent to the American Board of Urology ("ABU") in June of 2011, in which he sought the ABU's approval to admit Plaintiff into its program at a mid-way point in TUH's typically 6-year program, given Plaintiff's prior enrollment at Ohio State. (See Defs.' Ex. 12; see also Defs.' Statement of Add'l Facts ¶ 23.) In that email, Dr. Mydlo wrote that Plaintiff "has not only clearly satisfied my program's pre-urology requirements but also those of the ACGME for graduation." (Id.) Plaintiff urges us to conclude based on this language that Dr. Mydlo himself declared in June of 2011, before Plaintiff had even been admitted to TUH's program, that Plaintiff was qualified to graduate from the TUH program. This, however, is an unreasonable reading of Dr. Mydlo's email, which plainly conveyed only that Dr. Mydlo believed at the time that Plaintiff was qualified to "graduate" from his prior training levels and to enter TUH's program at the stated mid-way point. Accordingly, we do not find this

letter to carry any probative value as to Plaintiff's ultimate qualifications to receive credit for his PGY-4 year or to be promoted to his PGY-5 year in the TUH program.

We also conclude that the simple fact that Plaintiff performed numerous surgeries at TUH – and more than his Caucasian counterpart – does not support a conclusion that he performed those surgeries well or that, during those surgeries, he exhibited the skills that TUH considered necessary for promotion to the PGY-5 year, such that he was qualified for a promotion. Likewise, TUH's presentation of a contract for his PGY-5 year does not support a conclusion that Plaintiff was qualified for a promotion where the contract was not fully executed. (Defs.' Ex. 25.) The record shows that the contract was prepared, for administrative reasons, before year-end evaluations were completed. (Ex. 5 to Defs.' Reply Br. at 35-36.) In addition, Dr. Mydlo testified that he signed the contract without reading it and that his signature was not an indication that he believed that Plaintiff should be promoted. (Defs.' Ex. 27; Mydlo Dep., at 139-40 (testifying that Dr. Mydlo was given a stack of renewal letters that he signed without looking at the detail).) In addition, the fact that Plaintiff did not receive universal performance reviews of "unsatisfactory" or "deficient" does not support a conclusion that he was qualified for a promotion, when, irrespective of his other ratings, he received numerous "unsatisfactory" and "deficient" ratings and no doctor rated him above "approaching expectations" on clinical competence.[6] (See, e.g., Defs.' Ex. 17 at 1-2; Defs.' Ex. 20 at 4-6; Defs.' Ex. 21 at 3-4; Defs.' Ex. 24 at 1-4.) Finally, Dr. Mydlo's December 5, 2013 letter of recommendation to Mt. Sinai, while largely positive, cannot reasonably be read to support a conclusion that Plaintiff was qualified for a promotion

---

[6] Plaintiff also argues that we should discount his evaluations because they were not submitted in a timely fashion but, rather, were almost all submitted in May of 2012, after Dr. Mydlo had already made his decision not to promote Plaintiff. (Mydlo Dep. at 245 (stating that Dr. Mydlo made decision to terminate Plaintiff in April or May).) He has proffered no evidence, however, that the evaluations do not accurately reflect the opinion of the doctors who submitted them. Accordingly, we will not discount them in spite of the doctors' delay in submitting them.

sixteen months before, when he was advised that he would not be promoted to PGY-5 because of a variety of performance deficiencies. (See Pl.'s Mydlo Ex. 25.)

In sum, Plaintiff has simply pointed to no evidence from which a reasonable jury could conclude that he was qualified to be promoted to PGY-5 and continue in the TUH program. Accordingly, he has failed to satisfy that essential element of his prima facie case.

We also conclude that Plaintiff has failed to identify evidence of circumstances surrounding his failure to be promoted within the TUH program that gives rise to a reasonable inference that intentional discrimination was the reason for his termination. The primary evidence on which Plaintiff relies in asserting that he was the victim of racial animus is the evidence that Defendants considered his Indian accent and difficulty with the English language in evaluating him. (See Defs.' Ex. 20 at 3 (stating that Plaintiff "struggles with the English language which is a barrier between him and hospital staff" and that he "[n]eeds to be more aware of the language barrier and make a stronger effort to ensure that he is understood."); Defs.' Ex. 20 at 6 (stating that Plaintiff has "problems with the English language" and expressing fear that Plaintiff uses those problem as "cover for his clinical inadequacies"); see also Defs.' Ex. 17 at 1-2 (stating that Plaintiff "has a significant communication barrier that makes it difficult to understand and comprehend orders"); Defs.' Ex. 19 at 2 (noting that "succinct directives to ancillary staff seems to be a communication gap"); Defs.' Ex. 22 at 3 (observing that Plaintiff's "communication skills are sub-par").) There can be no question, however, that a medical professional's ability to communicate effectively with both patients and colleagues is an important attribute, as is evidenced by TUH's resident evaluation form, which includes questions about "interpersonal and communication skills." (E.g., Defs.' Ex. 17 at 1-2); see also Le v. City of Wilmington, 736 F. Supp. 2d 842, 855 (D. Del. 2010) ("'[A]n employee's heavy accent or difficulty with spoken

English can be a legitimate basis for adverse employment where effective communication skills are reasonably related to job performance'" (quoting <u>Yili Tseng v. Florida A & M Univ.</u>, 380 F. App'x 908, 909 (11th Cir. 2010)); <u>Fragante v. City & Cty. of Honolulu</u>, 888 F.2d 591, 596-97 (9th Cir. 1989) ("An adverse employment decision may be predicated upon an individual's accent when . . . it interferes materially with job performance. There is nothing improper about an employer making an honest assessment of the oral communications skills of a candidate for a job when such skills are reasonably related to job performance." (citations omitted)). Accordingly, we conclude that the references in Plaintiff's reviews to difficulties that he had communicating on account of his accent and/or his lack of full command of the English language simply cannot be attributed to racial bias, at least in the absence of any other evidence of racially discriminatory intent.

We also conclude that no reasonable jury could draw an inference that Defendants had a discriminatory intent based on the other evidence upon which Plaintiff relies. First, while Plaintiff argues that an inference can be drawn from the fact that two other Indian residents did not complete the TUH program, the undisputed record evidence reflects that only one of the Indian residents was terminated from the program due to subpar clinical competence, while the other voluntarily withdrew from the program to pursue another specialty. (Mydlo Dep. at 152-53, 230.) Moreover, two Caucasian residents were also terminated from the program due to subpar clinical competence. (<u>Id.</u> at 153, 155.) Consequently, we conclude that the record reflects no discernible pattern of targeting Indian residents for termination from the program. Finally, we find that no reasonable inference of discriminatory conduct can be drawn from the fact that Plaintiff's Caucasian counterpart was permitted to continue in the program in spite of poor scores on the board exam, as the undisputed evidence shows that board exam scores are just one component of a

resident's evaluation (id. at 234), and that Plaintiff's counterpart otherwise was found to be doing a "terrific job," was a "hard worker," was "very conscientious," had "excellent interpersonal skills, and work[ed] well with the ancillary staff" (id. at 236). See also id. at 234-36 (explaining that TUH looks at the "whole picture" and that high scores do not necessarily make a good doctor)).

For the foregoing reasons, we conclude that the record simply does not support a reasonable conclusion that Plaintiff was qualified to receive credit for his PGY-4 year, to be promoted to his PGY-5 year, and to continue in the TUH program, and that the record does not support a reasonable inference of intentional discrimination. We therefore conclude that Plaintiff has not established a prima facie case of racial discrimination in connection with his claims in Counts I, II, and V, and we grant summary judgment in Defendants' favor on his race discrimination claims in those Counts.

### B.    Retaliation (§ 1981)

In Counts III, V, and VII, Plaintiff asserts § 1981 retaliation claims, claiming that Defendants retaliated against him after he complained that he had suffered racial discrimination during his PGY-4 year at TUH by issuing negative performance reviews, failing to honor the PGY-5 contract, and making a false report to the Federation of State Medical Boards. Defendants argue that we should enter judgment in their favor on Plaintiff's retaliation claims because Plaintiff has not established essential elements of his prima facie case – namely, that he engaged in protected activity or that the purported protected activity was causally connected to any adverse employment action. They also contend that, even if Plaintiff has satisfied his burden of identifying genuine issues of material fact with respect to his prima facie case, judgment should be entered in their favor because he has failed to identify evidence that would support a reasonable conclusion that their non-discriminatory reasons for their actions were pretext.

To make out a prima facie case of retaliation, an employee must "show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Solomon v. Philadelphia Newspapers, Inc., No. 08-2839, 2009 WL 215340, at *2 (3d Cir. Jan. 30, 2009) (citing Marra v. Philadelphia Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007)). "If the employee establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-retaliatory reason for the adverse action." Id. (citing Marra, 497 F.3d at 300). "If the employer meets this burden, the burden of production shifts back to the employee to show, by a preponderance, that 'the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action.'" Id. (quoting Marra, 497 F.3d at 300-01). "The employee must prove that 'retaliatory animus played a role in the employer's decisionmaking process and that it had a determinative effect on the outcome of the process.'" Id. (quoting Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 187 (3d Cir. 2003)). Accordingly, "[t]he onus is on the plaintiff to establish causation at two stages of the case: initially, to demonstrate a causal connection as part of the prima facie case, and at the final stage of the . . . framework to satisfy [his] ultimate burden of persuasion by proving pretext." Carvalho-Grevious, 851 F.3d at 257.

Plaintiff contends that he engaged in protected activity insofar as he complained about racial discrimination on a number of occasions between December 2011 and May 2012. He contends that Defendants retaliated against him based on these complaints by (1) submitting, in May of 2012, poor assessments for his performance from July 1, 2011 through February 29, 2012 (see, e.g. Defs' Exs. 17-20); and (2) refusing to honor his PGY-5 contract on June 6, 2012, the date on which they informed him that he would not be permitted to continue in the program. He

further contends that TUH and Dr. Mydlo retaliated against him by falsely reporting to the Federation of State of Medical Boards that he had been on probation while in the TUH program.

To establish that he engaged in protected activity, Plaintiff testified at his deposition that he complained to Dr. Mydlo about racial discrimination in December 2011, March 2012, April 2012, and May 2012.[7] (Pl.'s Dep. at 327-38). Plaintiff provides no specific information about the complaints he made in March, April, and May 2012. However, he testified that, in December 2011, he advised Dr. Mydlo that Dr. Hirshberg had commented on his accent in front of other people and that he had told Dr. Hirshberg that this was racial discrimination. (Id. at 165, 167.) Defendants correctly point out that these allegations of protected activity are vague and supported only by Plaintiff's self-serving deposition testimony. Nevertheless, viewing the evidence in the light most favorable to Plaintiff, we conclude that Plaintiff has pointed to evidence in the record that, if credited, would establish that he engaged in protected activity by complaining to Drs. Mydlo and Hirshberg that he was a victim of racially discriminatory conduct.

We also conclude, however, that that there is no evidence in the record from which a reasonable jury could find that there was a causal connection between this protected activity and any adverse employment actions that can be attributed to Defendant Doctors Uzzo, Greenberg, Chen, Charles, Kutikov and Shibutani. Most critically, Plaintiff cannot establish that there is a causal connection between his protected activity and either the negative performance reviews

---

[7] Plaintiff has also submitted evidence that he complained to Dr. Uzzo regarding discrimination, but the record reflects that this complaint was made in September of 2015, more than three years after he left the TUH program and more than two years after Dr. Mydlo's allegedly false report to the Federation of State Medical Boards in July of 2013. (See Ex. 6 to Defs' Reply Mem.; Pl.'s Ex. Mydlo 31; Pl.'s Ex. 3 at 45-46.) Accordingly, Plaintiff's complaint to Dr. Uzzo could not have given rise to the asserted retaliation. See Solomon, 2009 WL 215340, at *2 (stating that to establish a prima facie case of retaliation, the adverse action by the employer must occur "either after or contemporaneous with the employee's protected activity" (citation omitted)).

authored by these doctors or the termination of his PGY-5 contract, because he has presented no evidence that any of these Defendant Doctors had any knowledge of Plaintiff's complaints to Dr. Mydlo or Dr. Hirshberg.   See Boykins v. SEPTA, No. 17-1980, 2018 WL 460652, at *6 (3d Cir. Jan. 17, 2018) ("A plaintiff 'cannot establish that there was a causal connection without some evidence that the individuals responsible for the adverse action knew of the plaintiff's protected conduct at the time they acted.'" (quoting Daniels v. Sch. Dist. of Philadelphia, 776 F.3d 181, 196 (3d Cir. 2015) (additional citation omitted)).   In addition, Plaintiff has presented no evidence that these Defendant Doctors or Dr. Hirshberg had any involvement in the ultimate decision to terminate Plaintiff's PGY-5 contract.   (See Defs.' Ex. 2 at 64 (stating that it was ultimately Dr. Mydlo's decision alone whether a resident's contract would be extended); Defs.' Ex. 5 at 55 same).)   Accordingly, we grant summary judgment in favor of Defendant Doctors Uzzo, Greenberg, Chen, Charles, Kutikov, and Shibutani on Plaintiff's retaliation claims against them in Counts III and V, and we grant judgment in favor of Defendant Dr. Hirshberg on the retaliation claim in Count V grounded on the decision to terminate Plaintiff's contract.

We also conclude that Plaintiff has failed to establish a prima facie case of retaliation against Dr. Mydlo and TUH based on Dr. Mydlo's report to the Federation of State Medical Boards because, as Defendants argue, Plaintiff has not established that the report constituted an "adverse employment action" that can support a prima facie case of retaliation.   To constitute an "adverse employment action," retaliatory conduct must be such that it "'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"   Moore v. City of Philadelphia, 461 F.3d 331, 341 (3d Cir. 2006) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006)).   In that regard, the conduct must be "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment," Cardenas v.

<u>Massey</u>, 269 F.3d 251, 263 (3d Cir. 2001) (quotation omitted), and "must be more than *de minimus* or trivial,'" <u>Brennan v. Norton</u>, 350 F.3d 399, 419 (3d Cir. 2003) (quoting <u>Suarez Corp. Indus. v. McGraw</u>, 202 F.3d 676, 686 (4th Cir. 2000)). Here, Plaintiff has not pointed to any evidence that the misstatements in Dr. Mydlo's report to the Federation of State Medical Boards had any negative consequences, much less consequences that were more than *de minimus*. Indeed, while Plaintiff argues that Dr. Mydlo's report is "certainly" an adverse employment action that "Section 1981 was designed to prohibit," he cites no legal authority, and develops no facts, to support that position. (Pl.'s Mem. at 15.) We therefore grant summary judgment in TUH's and Dr. Mydlo's favor on Plaintiff's retaliation claim in Count VII based on Dr. Mydlo's report to the Federation of State Medical Boards.

Thus, the only remaining retaliation claims are the claim against Dr. Hirshberg in Count III grounded on Hirshberg's negative performance reviews and the claims against Dr. Mydlo and TUH in Counts III and V grounded on Dr. Mydlo's May 2012 negative performance review and the termination of Plaintiff's PGY-5 contract. As noted above, to establish his prima facie case with respect to these claims, Plaintiff must establish that the adverse employment actions were causally connected to his protected activity, which means that he must "produce evidence 'sufficient to raise the inference that [his] protected activity was the *likely* reason for the adverse [employment] action.'" <u>Carvalho-Grevious</u>, 851 F.3d at 259 (second alteration in original) (quoting <u>Kachmar v. SunGard Data Sys., Inc.</u>, 109 F.3d 173, 177 (3d Cir. 1997)). Causation can be proven "by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity 'unusually suggestive of retaliatory motive.'" <u>Id.</u> (internal citations omitted) (quoting <u>Shaner v. Synthes</u>, 204 F.3d 494,

505 (3d Cir. 2000)). "'[T]he proferred evidence, looked at as a whole, may [also] suffice to raise the inference.'" Id. (quoting Kachmar, 109 F.3d at 177).

Plaintiff cannot establish the necessary causation for his claim that Dr. Hirshberg retaliated against him based on the existence of temporal proximity, because he complained to Dr. Hirshberg in December of 2011 (Pl.'s Dep. at 165, 167), and Dr. Hirshberg's negative performance reviews were submitted at least five months later, in May of 2012 (Defs.' Ex. 20.). See Carvalho-Grevious, 851 F.3d at 261 n.8 (observing that an intervening temporal period of two months cannot raise an inference of causation (citations omitted)); LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n, 503 F.3d 217, 233 (3d Cir. 2007) ("Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment.") Moreover, Plaintiff points to no evidence that Dr. Hirshberg offered inconsistent explanations for his negative performance evaluations of Plaintiff. He also points to no evidence (beyond the May 2012 performance reviews on which he bases his retaliation claim) that could provide support for a conclusion (1) that Dr. Hirshberg engaged in a "pattern of antagonism" towards him following his December 2011 complaint about racial discrimination or (2) that the "evidence as a whole" supports an inference of Dr. Hirshberg's retaliatory intent. We therefore conclude that Plaintiff has failed to produce evidence from which a reasonable factfinder could conclude that Plaintiff's December 2011 complaint of racial discrimination was the "likely reason" for Dr. Hirshberg's negative performance reviews, Carvalho-Grevious, 851 F.3d at 259, and we grant summary judgment in Dr. Hirshberg's favor on that retaliation claim.

In contrast, there is more significant temporal proximity between Plaintiff's asserted complaints to Dr. Mydlo about discriminatory conduct in April 2012 and May 2012, and (1) Dr. Mydlo's negative performance review (in May 2012) (Defs.' Ex. 17), and (2) Dr. Mydlo's and TUH's decision not to promote Plaintiff to his PGY-5 training year (sometime between April and June of 2012) (see Defs.' Exs. 26, 28.).   We therefore conclude that, viewing the evidence in the light most favorable to Plaintiff, Plaintiff has pointed to evidence that creates a genuine issue of material fact as to whether there is a causal connection between Plaintiff's protected activity and these asserted adverse employment actions, such that he has satisfied his prima facie case in that regard.   See Schlegel v. Koteski, 307 F. App'x 657, 661 (3d Cir. 2009) (stating that "[a] showing of 'unusually suggestive' temporal proximity between the protected activity and the adverse action can be sufficient" to establish the requisite causal link for a retaliation claim) (quoting Doe v. C.A.R.S. Prot. Plus, Inc., 527 F.3d 358, 369 (3d Cir. 2008)).

We must therefore consider whether Defendants have articulated a legitimate non-discriminatory reason for their actions and whether Plaintiff has put forth evidence that Defendants' proffered explanation was false and that the real reason for Defendants' actions was retaliation.   See Solomon, 2009 WL 215340, at *2 (citing Marra, 497 F.3d at 300-01).   Here, there is plentiful evidence that both Dr. Mydlo's May 2012 performance review and the decision not to promote Plaintiff to PGY-5 were based on reports from multiple faculty members that Plaintiff was providing "substandard patient care, not paying attentions to detail, blaming others for problems that were happening."   (Mydlo Dep. at 63-66; Defs.' Ex. 28 at 1 (setting forth reasons for decision not to promote Plaintiff, including Plaintiff's "low performance," "problems with communication, patient management and surgical ability," and inability to manage

complicated patients).)   Accordingly, we find that Defendants have met their burden of articulating a non-discriminatory reason for their actions.

In response, Plaintiff has identified no evidence that would support a reasonable conclusion that the "proferred explanation was false and that retaliation was the real reason for [Dr. Mydlo's performance review and the decision not to promote Plaintiff]."   Solomon, 2009 WL 215340, at *2 (quoting Marra, 497 F.3d at 300-01).   Indeed, in arguing that he has established pretext, Plaintiff relies on the same evidence on which he relied in arguing that Defendants' failure to promote him occurred under circumstances that could give rise to an inference of intentional racial discrimination, asserting that he need not come forward with evidence of discrimination beyond that which he presented in his prima facie case.   (See Pl.'s Mem. at 15-17 (addressing pretext)).   We have already considered this evidence and concluded that it was insufficient to support a prima facie case of racial discrimination as it did not give rise to a reasonable inference that intentional discrimination was the reason for Plaintiff's failure to be promoted within the TUH program.   (See supra pp. 18-19.)   It likewise does not give rise to an inference that retaliation for Plaintiff's protected activity was the real reason for the asserted adverse actions.   Indeed, there is simply no basis in the record on which a reasonable factfinder could conclude that Plaintiff received a poor performance review from Dr. Mydlo and was not promoted to PGY-5, not because Plaintiff performed poorly in his PGY-4 year as Defendants' assert, but because Dr. Mydlo and TUH harbored retaliatory animus against Plaintiff on account of his informal complaints of discrimination.   In the absence of any such evidence of pretext, we conclude that Plaintiff has failed to sustain his burden on summary judgment of identifying evidence that would support a claim of retaliation grounded on Dr. Mydlo's performance review or the failure to promote Plaintiff to his PGY-5 year.

For all of the above reasons, we grant Defendants' Motion for Summary Judgment as to Plaintiff's retaliation claims in m Counts III, V, and VII, and we enter summary judgment in favor of Defendants' on those claims.

**C.    Hostile Work Environment (§ 1981)**

Plaintiff claims in Count IV of the First Amended Complaint that Defendants subjected him to a hostile work environment on account of his race in violation of § 1981.   Defendants argue, inter alia, that the record contains no facts that would support such a claim.

For purposes of a claim brought pursuant to § 1981, "[a] hostile work environment exists when the 'workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"  Boyer v. Johnson Matthey, Inc., Civ A. No. 02-8382, 2005 WL 35893, at *12 (E.D. Pa. Jan. 6, 2005) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 116 (2002)).   To prevail on a hostile work environment claim grounded on racial harassment, "a plaintiff must show that '1) the employee suffered intentional discrimination because of his/her [race], 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability [meaning the employer is responsible].'"  Castleberry v. STI Grp., 863 F.3d 259, 263 (3d Cir. 2017) (alterations in original) (quoting Mandel v. M & Q Packaging Corp., 706 F.3d 157, 167 (3d Cir. 2013). "Whether an environment is hostile requires looking at the totality of the circumstances, including: 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'"  Id. at 264 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 23

(1993)).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not alone give rise to a hostile work environment.  <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788 (1998) (quotation omitted).

Plaintiff argues that there is evidence in the record that creates a genuine issue of material fact as to whether he was subjected to a hostile work environment.  In support of this argument, he cites exclusively to the evidence of workplace conditions that Defendants' acknowledged and referenced in their Motion.  (<u>See</u> Pl.'s Mem. at 17-18 ("[T]he evidence as Defendants themselves present it[] conclusively shows sufficient evidence to deny summary judgment on [the] hostile work environment claim.")).  The referenced evidence includes Plaintiff's deposition testimony that Dr. Hirshberg would make him "feel really bad" because he would ask Plaintiff something, ask him to repeat his answer, and then laugh.  (Pl.'s Dep. at 162.)  It also includes Plaintiff's testimony that it was "very painful" to him when, in April 2012, Dr. Chen stated to him during an operation: "Rao, it's not that you don't know urology.  It's not that you cannot operate, but urology career is not for you or someone like my racial background.  And . . . this is not only my opinion.  This is a collective opinion from the faculty."  (<u>Id.</u> at 174.)  It also includes Plaintiff's testimony that Dr. Charles repeatedly asked him when he started learning English, how many languages he spoke, and whether his education was in English.  (<u>Id.</u> at 162-63.)  He further testified that other clinical faculty were present when Dr. Charles and Dr. Hirshberg made comments and that he perceived them all to be "making jokes of [him]."  (<u>Id.</u> at 164.)

Such evidence, however, even viewed in the light most favorable to Plaintiff, is simply insufficient to support a reasonable conclusion that Plaintiff endured a hostile work environment. Far from evidencing "severe or pervasive" discrimination that created an "abusive working environment," this evidence, at most, demonstrates that Plaintiff was subjected to "teasing,

offhand comments, and isolated incidents" that were not extremely serious. Boyer, 2005 WL 35893, at *12 (quotation omitted); Faragher, 524 U.S. at 786, 788 (quotations omitted). Moreover, there is no evidence that the referenced conduct was "physically threatening or humiliating," or that it unreasonably interfered with Plaintiff's work performance. Castleberry, 863 F.3d at 264 (citation omitted). We therefore conclude that Plaintiff has failed to point to evidence that creates a genuine issue of material fact as to the existence of a hostile work environment. Consequently, we grant Defendant's Motion for Summary Judgment as to Count IV of the Complaint, and enter judgment in Defendants' favor on the hostile work environment claim.

### D. Defamation

In Count X of the First Amended Complaint, Plaintiff asserts a claim of defamation against Dr. Mydlo and TUH, grounded on Dr. Mydlo's report to the Federation of State Medical Boards, which, as noted above, incorrectly reported that Plaintiff was a level one resident and had been on probation during his participation in the TUH urology program. Defendants argues both that this claim is barred by a release that Plaintiff signed on August 24, 2012, and that Plaintiff has failed to establish a defamation claim because he has produced no evidence that he suffered harm as a result of Defendant's allegedly defamatory statements.

Under Pennsylvania law, a contractual release will be enforced if:

(1) the contract [does] not contravene any policy of law; (2) the contract [is] an agreement between individuals relating to their private affairs; (3) each party to the agreement [is] a free bargaining agent, not one drawn into an adhesion contract with no recourse but to reject the whole transaction; and (4) the agreement . . . express[es] the intent of the parties with the utmost particularity.

Arce v. U-Pull-It Auto Parts, Inc., Civ. A. No. 06-5593, 2008 WL 375159, at *4 (E.D. Pa. Feb. 11, 2008) (citing Schiele v. Simpson Safety Equip., Inc., Civ. A. No. 91-1872, 1992 WL 73588, at *3

(E.D. Pa. Apr. 7, 1992); Employers Liab. Assurance Corp. v. Greenville Bus. Men's Ass'n, 224 A.2d 620, 622-23 (Pa. 1966)).   Although releases "are not favored by the law and must be construed strictly against the party who seeks to avoid liability, a court 'must use common sense in interpreting the agreement.'"   Id. (quoting Nicholson v. Mt. Airy Lodge, Inc., Civ. A. No. 97-1296, 1997 WL 805185, at *3 (E.D. Pa. 1997)).

> Here, the release that Plaintiff signed stated in relevant part as follows:

> I extend absolute immunity to, and release from any and all liability, [TUH] and its affiliates, their respective, employees, officers, directors, agents, and any third parties for any actions, recommendations, reports, statements, communications, or disclosures, whether oral, written or otherwise, involving me and/or related to my admission, participation in, and dismissal from the [TUH] residency program. This includes, without limitation, matters, inquiries, or letters of reference concerning my professional qualifications, credential, medical knowledge, clinical competence, character, mental or emotional stability, physical condition, ethics or behavior and any other matter that might directly or indirectly have any effect on, or relate[] to, my abilities, education, competence, patient care, participation in another residency program, [or] skills . . . .

(Defs.' Ex. 31.)   Plaintiff does not argue that the release is unenforceable because it does not meet one of Pennsylvania's legal criteria for an enforceable release.   See Arce, 2008 WL 375159, at *4 (citations omitted).   Rather, he simply argues, without citation to any legal authority or reference to pertinent language in the release, that the release does not cover liability for the disclosure of "*false* information."   (Pl.'s Mem. at 21.)   We reject this factual argument, however, as the release, on its face, "extends absolute immunity" and releases TUH and its employees for "any and all liability" for "any actions, . . . reports, communications, or disclosures . . . involving [Plaintiff] and/or related to [his] participation in . . . the [TUH] residency program." (Id. (emphasis added)).   Using "'common sense,'" we can only conclude that the release is unambiguous and in no way excludes liability for false statements.   Arce, 2008 WL 375159, at *4 (quoting Nicholson, 1997 WL 805185, at *3).   Accordingly, we conclude that the release

unambiguously bars Plaintiff's defamation claim arising out of Dr. Mydlo's report to the Federation of State Medical Boards.

In addition, even absent the release, we conclude that Plaintiff has failed to adduce evidence to support a defamation claim based on Dr. Mydlo's report. To establish defamation under Pennsylvania law, a plaintiff must prove, inter alia, that he suffered "[s]pecial harm resulting . . . from [the defamatory statement's] publication." 42 Pa. Cons. Stat. Ann. § 8343(a)(6). "The term 'special harm' is defined as 'actual damages which are economic or pecuniary losses.'" Patel v. Patel, Civ. A. No. 14-2949, 2015 WL 6735958, at *5 (E.D. Pa. Nov. 4, 2015) (quoting Sprague v. Am. Bar Ass'n, 276 F. Supp. 2d 365, 368-69 (E.D. Pa. 2003)). Here, Plaintiff has submitted no evidence to establish that Dr. Mydlo's report to the Federal of State Medical Boards resulted in any harm, much less that it caused him actual damages. Accordingly, Plaintiff's defamation claim fails for this reason as well.

We therefore grant Defendants' Motion for Summary Judgment, and grant judgment in Defendants' favor, as to the defamation claim in Count X.

### E. Breach of Contract

In Counts VIII and IX of the First Amended Complaint, Plaintiff asserts breach of contract claims for breaches of his PGY-4 and PGY-5 contracts and breach of an agreement to provide him with a letter of recommendation. Defendants have moved for summary judgment on both Counts, arguing that, based on the evidence presented, no reasonable jury could return a verdict in favor of Plaintiff on either claim. Plaintiff contends in his Memorandum that he has put forth sufficient evidence to support his claim that TUH and Mydlo breached his PGY-4 contract, as set forth in Plaintiff's May 9, 2011 offer letter for his PGY-4 year, insofar as they breached the provision of that contract requiring the Program Director (Dr. Mydlo) to "inform [Plaintiff] in

writing **no less than 4 months** prior to the end of [his] current training year, if [his] appointment is terminated, or if [he] will continue in the Program at the same PGY level."  (Defs.' Ex. 14 at 1; Pl.'s Mem. at 22-23.)   We therefore understand this to be the only breach of contract claim that Plaintiff is still pursuing, and we grant summary judgment in Defendant's favor on all other aspects of Plaintiff's breach of contract claim.[8]

In order to prevail on a breach of contract claim under Pennsylvania law, a plaintiff must establish "'(1) the existence of a contract, (2) a breach of the duty imposed by the contract and (3) damages resulting from the breach.'"  <u>Sewer Auth. of the City of Scranton v. Pa. Infrastructure Inv. Auth.</u>, 81 A.3d 1031, 1041-42 (Pa. Commw. Ct. 2013) (quoting <u>Orbisonia-Rockhill Joint Mun. Auth. v. Cromwell Twp.</u>, 978 A.2d 425, 428 (Pa. Commw. Ct. 2009)) Moreover, the plaintiff must prove the resulting damages with "reasonable certainty." <u>ATACS Corp. v. Trans World Commc'ns, Inc.</u>, 155 F.3d 659, 669 (3d Cir. 1998) (citations omitted)).

Here, Defendants do not dispute that the May 9, 2011 offer letter constitutes a binding contract.  Moreover, there is evidence that the first formal written notice to Plaintiff that his appointment was being terminated was on June 6, 2012, which was approximately seven weeks before the July 20, 2012 end date of the contract.   (Defs.' Ex. 28; Defs.' Ex. 14 at 1 ("The term of this Agreement shall be from 7/21/2011 through 7/20/2012 . . . .").)   Accordingly, Plaintiff has produced evidence that TUH breached its contractual obligation to "inform him in writing **no less than 4 months** prior to the end of [his] current training year, if [his] appointment is terminated . .

---

[8] Specifically, we grant judgment in Defendants' favor on Plaintiff's other breach of contract claims, including that TUH and Dr. Mydlo breached the PGY-4 and/or PGY-5 contracts by denying him credit for the PGY-4 year and terminating the PGY-5 contract (included in Count VIII), and that TUH and Dr. Mydlo breached an oral agreement to provide Plaintiff with a positive letter of recommendation (Count IX).   (<u>See</u> Am. Compl. ¶¶ 133, 146.)

. . ." (Defs.' Ex. 14 at 1.) The record therefore includes evidence to support the first two elements of Plaintiff's breach of contract claim.

Plaintiff has not, however, pointed to any evidence that he was damaged by the asserted breach, much less produced evidence that could prove his damages to a "reasonable certainty." ATACS Corp., 155 F.3d at 669. Indeed, in spite of the evidence that TUH provided Plaintiff with late notice of the termination of his appointment, the undisputed evidence demonstrates that TUH offered Plaintiff the opportunity to continue in the program for four months after it provided notice, i.e., until November 19, 2012, which was four months after the original contract termination date. (Defs.' Ex. 28 at 2 ("To give you ample opportunity to secure employment options, you are being provided with 4 months notice from the end of your current contract period. Therefore, you will be terminated from the program effective November 19, 2012.").) Moreover, the undisputed evidence also demonstrates that Plaintiff instead resigned from the TUH program effective July 20, 2012. (See Defs.' Ex. 30.) Under these circumstances, the evidence in no way suggests that Plaintiff suffered damages as the result of TUH's late notice.[9] In the absence of any such evidence, we conclude that Plaintiff has failed to point to any evidence that would establish damages arising from the asserted breach and, thus, that no reasonable jury could find in Plaintiff's favor on the breach of contract claim based on the record before us. We therefore grant Defendants' Motion for Summary Judgment as to Plaintiff's breach of contract claim and grant judgment in Defendants' favor on Count VIII.

---

[9] Plaintiff asserts in the First Amended Complaint that he "suffered multiple damages" as a result of TUH's breach, "including but not limited to loss of income, loss of future income, and the ability to become eligible for certification by the American Board of Urology." (Am. Compl. ¶ 140.) However, Plaintiff does not point to any evidence that such losses were the result of TUH's delay in notifying him of his termination and does not even articulate a theory as to how the delay could have caused such damages. Accordingly, we conclude that there is no evidence in the record that supports a reasonable conclusion that the losses alleged in the Amended Complaint are attributable to the delayed notice of termination.

## IV.    CONCLUSION

For the foregoing reasons, we grant Defendants' Motions for Summary Judgment in its entirety and enter judgment in favor of Defendants.   An appropriate Order follows.

BY THE COURT:

/s/ John R. Padova, J.

_____
John R. Padova, J.